# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                                           **Case No. 8:21-cr-213-RAL-SPF**

**JORGE FERRETIZ-HERNANDEZ**

_____/

## MOTION TO DISMISS:
### CHALLENGE TO THE CONSTITUTIONALITY OF 8 U.S.C. § 1326

**NOW COMES** Defendant, by and through undersigned counsel, and moves this

Court to dismiss the indictment.

## MEMORANDUM OF LAW

Laws that were enacted with a racially discriminatory purpose, and which

have a discriminatory effect, are unconstitutional under Equal Protection principles.

Enacted at the height of the eugenics movement, the "Undesirable Aliens Act of

1929" was conceived, drafted, and enacted by white supremacists out of a belief that

the "Mexican race"[1] would destroy the racial purity of the United States.  Legislators

---

[1] In the early 20th century, "Mexican" was conceptualized as a race rather than a nationality. For instance, the 1930 census listed "Mexican" as a "Color or Race." United States Census Bureau, *History: 1930*, https://www.census.gov/history/www/through_the_decades/index_of_questions/1930_1.html. And "[f]rom at least 1846 until as recently as 2001 courts throughout the United States have utilized the term 'Mexican race' to describe Latinos." Lupe S. Salinas, *Immigration and Language Rights: The Evolution of Private Racist Attitudes into American Public Law and Policy*, 7 Nev. L.J. 895, 913 (2007).  Equal Protection doctrine generally treats Mexican, Central, or South American ancestry or ethnicity as identical to race. *See* Juan F. Perea, *Ethnicity and the Constitution:  Beyond the Black and White Binary Constitution*, 36 Wm. & Mary L. Rev. 571, 595 (1995) (citing *Hernandez v. New York*, 500 U.S. 352, 355 (1991) (plurality opinion)); *see also Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (referring to the relevant class as "Latinos" in the context of an Equal Protection animus claim).

referred to Mexicans as "mongrels" and "peons."[2]  They claimed Mexicans were "poisoning the American citizen."[3]  They sought to keep the country's blood "white and purely Caucasian."[4]  They solicited reports and testimony from a eugenicist who likened immigration policy to the "breed[ing] of thoroughbred horses."[5]  Not only did this racism underlie the original illegal reentry law and § 1326, the law has disparately impacted Mexicans and other Latinos in the century since.

Because the historical and statistical evidence presented here shows that § 1326 was enacted with a discriminatory purpose and still has a disparate impact, the statute is presumptively unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  The burden thus shifts to the Government to show that Congress would have § 1326 in the absence of any discriminatory purpose.  If the Government cannot make this showing, the law is invalid, and the Court must dismiss the indictment.  In the alternative, if the Court finds that Mr. Ferretiz-Hernandez has not shown a discriminatory purpose or a

---

[2] Benjamin Gonzales O'Brien, *Handcuffs and Chain Link: Criminalizing the Undocumented in America* 41, 46-47 (Univ. of Va. Press 2018); Exhibit D, Rep. Patrick O'Sullivan, "Administration of the Law," *Congressional Record* 65:6 (1924), p. H5900.
[3] *See* Ex. C at H3620.
[4] *See* Ex. F at H2462.
[5] *See* Ex. B at 44.

disparate impact on the papers alone, the Court should hold an evidentiary hearing at which he may present expert testimony and other evidence.

## ARGUMENT

The Fifth Amendment of the Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.  This clause contains an implicit guarantee of equal protection in federal laws identical to what the Fourteenth Amendment guarantees in state laws.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1686 n.1 (2017).

A law may violate equal protection in three ways.  First, a law may discriminate on its face.  *See*, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967).  Second, authorities may apply a facially neutral law in a discriminatory way.  *See*, *e.g.*, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Third, a legislature may enact a facially neutral law with a discriminatory purpose, which disparately impacts a disfavored group. *See*, *e.g.*, *Arlington Heights*, 429 at 265–68.

Here, § 1326 is unconstitutional under *Arlington Heights* because it was enacted with a discriminatory purpose and has a disparate impact.  There are two prongs to an Equal Protection challenge brought under *Arlington Heights*.  *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (citations omitted). First, the law's challenger must show that the law had "'a discriminatory purpose and

3

effect.'"  *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1188-89 (11th Cir. 1999)).  "Once discriminatory purpose and effect are established, the second prong provides that 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.'"  *Id*. (quoting *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).  If the Government cannot show that the legislature would have enacted the offending law in the "absence of the racially discriminatory motivation," the law violates the Fifth Amendment and must be invalidated.  *See Hunter*, 471 U.S. at 231.[6]

## I.  Section 1326 was enacted with a discriminatory purpose and has a discriminatory effect.

Determining whether a challenger has shown a discriminatory purpose requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arlington Heights*, 429 U.S. at 266.  Courts in the Eleventh Circuit consider the following non-exhaustive list of factors to determine whether a challenger has shown discriminatory purpose and effect under the first *Arlington Heights* prong:

---

[6] This challenge does not involve "rational basis" review.  *See, e.g., United States v. Osorto*, 995 F.3d 801, 810-11 (11th Cir. 2021) (discussing standards of review applicable when a law discriminates against noncitizens).  In *Osorto*, the protected class involved *alienage*; here the protected class involves *race*.  The *Arlington Heights* framework applies to this racial animus challenge, not the *Osorto* framework.  *See Regents of Univ. of Cal.*, 140 S. Ct. at 1916 (plurality opinion) (four justices applying *Arlington Heights* to a claim of racial animus against Latinos); *id*. at 1918 (Sotomayor, J., concurring) (same); *United States v. Carrillo-Lopez*, No. 3:20-cr-26-MMD-WGC (Doc. 60), slip op. at 2-5 (D. Nev. Aug 18, 2021) (applying *Arlington Heights* in an Equal Protection challenge to § 1326 because "race and national origin, not alienage, is the classification in dispute.").

(1) the impact of the challenged law;

(2) the historical background;

(3) the specific sequence of events leading up to its passage;

(4) procedural and substantive departures by the legislature;

(5) the contemporary statements and actions of key legislators;

(6) the foreseeability of the disparate impact;

(7) knowledge of that impact; and

(8) the availability of less discriminatory alternatives.

*Birmingham Ministries*, 992 F.3d at 1321-22 (citing *Arlington Heights*, 429 U.S. at 267-68; *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983)).  The various factors may overlap, and evidence of one factor may also be evidence of another factor.  *See id*. at 1322 n.33.

The threshold for satisfying these factors is low.  Since legislatures are rarely "motivated solely by a single concern," a challenger need not show that the legislature's actions "rested solely on racially discriminatory purposes."  *Arlington Heights*, 429 U.S. at 265–66.  Instead, the challenger need only show "proof that a discriminatory purpose has been a *motivating factor* in the decision."  *Id.* at 265–66 (emphasis added).

Courts have applied *Arlington Heights* to a variety of laws and government actions.  *See, e.g., Hunter*, 471 U.S. at 222.  *Hunter* involved a provision in the

5

Alabama constitution that barred voting for any person convicted of a "crime involving moral turpitude." *Id.* Though neutral on its face, the provision disenfranchised ten times as many blacks as whites. *Id.* at 227. To prove discriminatory intent in its passage, challengers submitted transcripts of the 1901 Alabama constitutional convention where lawmakers had originally enacted the provision, as well as several historical studies and the testimony of two expert historians. *See id.* at 229. This evidence showed that "zeal for white supremacy ran rampant" at the 1901 convention and was a "motivating factor" underlying the voting provision. *Id.* at 229–31. And because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the Supreme Court held that it violated the guarantee of Equal Protection. *Id.* at 231.

Section 1326 has a disparate impact on Mexicans and other Latinos. Further, each of the *Arlington Heights* factors supports a finding that the 1929 act was enacted with a discriminatory purpose. Racism was not only a "motivating" factor behind the 1929 and 1952 enactments of the federal crime of illegal reentry, it was the *primary* factor. Accordingly, the burden shifts to the Government to prove that Congress would have enacted the statute even without its discriminatory purpose.

A. The impact of the challenged law.

The prohibition against illegal reentry was first enacted by Congress in 1929.

6

*See* Pub. L. 70-1018 § 1, 45 Stat. 1551.  Within a year, the Government had

prosecuted 7,001 border crossing crimes; by 1939, that number rose to over 44,000.[7]

In each of these years, Mexicans comprised more than 84% of those convicted, and

often made up as many as 99% of defendants.[8]

      In more recent times, the overwhelming number of Border Patrol arrests along

the southern border have been of Mexicans or people of Latin American origin.  In

2000, over 98% of persons apprehended at the border were Mexican.  In 2005,

Mexicans made up 86% of apprehensions, and in 2010, 88%.[9]  In the last decade,

Mexicans have made up a smaller percentage of arrestees due to increased migration

from Central America, but combined, the two groups easily constitute the

overwhelming majority of border crossers.[10]  In 2010, 97.1% of defendants

prosecuted under § 1326 were Latin American.[11]  Recently, the number of

prosecutions has soared—in the last four years, the number of § 1326 cases has risen

---

[7]Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965* 138 (UNC Press 2017).

[8] *Id.* at 138–39 (citing U.S. Bureau of Prisons, *Federal Offenders*, Fiscal Years, 1931–36).

[9] *Border Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000–2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Total%20Monthly%20Family%20Unit%20Apprehensions%20by%20Sector%20%28FY%202013%20-%20FY%202019%29_0.pdf.

[10] *U.S. Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007 – 2019*, https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Nationwide%20Apprehensions%20by%20Citizenship%20and%20Sector%20%28FY2007%20-%20FY%202019%29_1.pdf.

[11] *See* Exhibit N, Mark Motivans, *Immigration Offenders in the Federal Justice System, 2010*, U.S. Dep't of Just.: Bureau of Just. Stat. 22 (2013).

by over 24% to 19,654,[12] making illegal reentry one of the most common federal felonies today.  According to available Sentencing Commission data, from fiscal years 2016 to 2020, 98.91% of defendants sentenced under the relevant guideline for § 1326 were Hispanic.[13]  Section 1326 therefore disparately impacts Mexicans and other Latinos.  *See United States v. Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *10-11 (D. Ore. 2021) (finding "ample evidence" of § 1326's disparate impact against Mexicans and other Latinos under *Arlington Heights*); *United States v. Carillo-Lopez*, No. 3:20-cr-26-MMD-WGC (Doc. 60), slip op. at 9-12 (similarly finding a disparate impact created by § 1326).[14]  Accordingly, the Court must consider the remaining *Arlington Heights* and *Birmingham Ministries* factors to determine whether the law was originally enacted with racial animus as a "motivating factor."

---

[12] *See* United States Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2020, *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf.

[13] Exhibit O.  The Sentencing Commission's data files, from which Exhibit O is drawn, are available at https://www.ussc.gov/research/datafiles/commission-datafiles.

[14] A finding of disparate impact is not impacted by *Regents*.  There, the Court discounted the challengers' evidence showing that Latinos were disparately impacted by a "cross-cutting immigration relief program" because Latinos make up an outsized share of the unauthorized alien population.  140 S. Ct. at 1915.  The Court explained, "Were this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."  *Id*. at 1915-16.  Here, by contrast, § 1326 is neither "cross-cutting" nor "generally applicable."  It targets only those who have been previously deported and who enter illegally, a prohibition that disparately impacts Mexicans and other Latinos within the population of unauthorized immigrants at large.  *See Carrillo-Lopez*, slip op. at 11 (rejecting the Government's reliance on *Regents*); *Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *11 n.64 (same).

B.  <u>The historical background.</u>

Historians often refer to the 1920s as the "Tribal Twenties"—a time when "the Ku Klux Klan was reborn, Jim Crow came of age, and public intellectuals preached the science of eugenics." Exhibit A, Declaration of Dr. Kelly Lytle Hernández, at 2. World War I had produced "a feverish sentiment against presumably disloyal 'hyphenated Americans,'" and "few could resist the combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction."[15]  Prominent restrictionists "spoke increasingly of 'racial indigestion,'"[16] and "the 'contamination' of Anglo-American society."[17]

The decade also brought a flood of immigration legislation fueled by fears of "non-white" immigration.[18]  Many politicians, especially those popularly known as "nativists," hoped to "restrict and even end immigration to the United States from every region of the world other than western Europe."  Ex. A, at 2.  At the start of the decade, Congress passed the first numerical restriction on immigration in the United States.  *See* Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5. During the remainder of the decade, legislators aimed for "'America [to] cease to be

_____

[15] Mae M. Ngai, *Impossible Subjects:  Illegal Aliens and the Making of Modern America*, 19-20 (Princeton U. Press 2004).

[16] *Id*. at 23.

[17] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol* 28 (U. Cal. Press 2010).

[18] *See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (Scribner 2019).

the "melting pot.'"[19]  Although the arrival of southern and eastern Europeans in the early 1900s "fueled the rise of American manufacturing," nativists saw these groups as "'undesirable immigrants'" who were "socially inferior, culturally alien, and politically suspect."[20]

These fears of non-white immigration were bolstered by the growing acceptance of the pseudo-science eugenics.[21]  The popular magazine *The Saturday Evening Post* ran articles warning that new immigrants were racially inferior, impossible to assimilate, and a threat to stability and democracy.[22]  The leader of a major scientific institution contended that neither education nor environment could alter the "'profound and inborn racial differences' that rendered certain people inferior."[23]  And states throughout the country were drafting laws "based on this burgeoning race science, including aggressive sterilization programs."[24]

At the center of the eugenics movement was Dr. Harry H. Laughlin, the director of the Eugenics Institute.[25]  Dr. Laughlin was well known for his model sterilization law that many states and countries, including the Third Reich of Nazi

---

[19] Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration* 3 (W.W. Norton & Co. 2020) (quoting Senator David A. Reed).
[20] Hernández, *supra* n.17, at 17-28.
[21] Yang, *supra* n.19 at 35.
[22] *Id*. at 8.
[23] Okrent, *supra* n.18, at 3.
[24] Yang, *supra* n.19, at 38.
[25] Ngai, *supra* n.15, at 24.

Germany, used as a template.[26]  During the 1920s, Dr. Laughlin testified before Congress multiple times and produced reports that discussed topics such as "race crossing," "mate selection," "fecundity," "racial composition," and the "individual quality of future population."  Exhibit B, *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization, House of Representatives*, 70th Cong. 70.1.4 , pp. 2-3 (1928).  Relying heavily on these theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade, including in the passage of the 1929 act.[27]

       C.  <u>The specific sequence of events leading up to the act's passage and the contemporary statements and actions of key legislators.</u>

       1.  The 1929 Act.

In the early 1920s, Congress began to focus its legislation around the exclusion of "undesirable" immigrants.  In the Emergency Immigration Act of 1921 Congress established immigration quotas based on the national origins of U.S. citizens as reflected in the 1920 census.  In 1924, Congress, lowered the quotas from 3% to 2%.  *See* National Origins Act, Pub. L. 68-139, 43 Stat. 153.

---

[26] *Harry Laughlin and Eugenics*, Truman State University. Accessible at
https://historyofeugenics.truman.edu/altering-lives/sterilization/model-law/.
[27] *See* E.P. Hutchinson, *Legislative History of American Immigration Law, 1798-1965*, 212-13 (1981); *Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *11 (finding that eugenics "heavily influenced the 1929 Act."); *Carrillo-Lopez*, slip op. at 15 (similar).

The quotas created by the National Origins Act were skewed to keep the nation's "racial strains" predominantly northwestern European.[28]  The law on its face did not count "nonwhite people residing in the United States" toward the quotas it established.  Accordingly, the law's newly created "Quota Board" interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawaii, Puerto Rico, and Alaska.[29]  Congress and the president accepted these exclusions under pressure to "stand firm against the efforts of 'hyphenates' who would 'play politics with the nation's blood stream.'"[30]

Yet there was a wrinkle in the National Origins Act—it did not set quotas on immigrants from countries in the Western Hemisphere. [31]  This was due to the influence of large agricultural businesses that relied heavily on labor from just over the border.  These agri-businesses pressured legislators from western states to vote against the law, forcing nativists in Congress to "choose between accepting a Mexican quota exemption or passing no immigration law at all."  Ex. A, at 3.  As one representative complained, there was no chance of capping the number of

---

[28] Ngai, *supra* n.15, at 22–25.
[29] *Id.* at 26.
[30] *Id.* at 35.
[31] *See* Hans P. Vought, *The Bully Pulpit and the Melting Pot: American Presidents and the Immigrant, 1897-1933* 191 (Mercer U. Press 2004).

Mexican immigrants because too many growers were "interested in the importation of these poor peons."  Ex. C, Representative John C. Box, "Deportation of Aliens," *Congressional Record*, (Feb. 16, 1929), p. H3619.  Another legislator complained that, "from a moral standpoint," Mexican immigrants were "poisoning the American citizen."  *Id*. at H3620.  A legislator entered into the Congressional Record an "eloquent and patriotic" radio address arguing that the quotas should be applied to Mexican immigrants because

> their population in the main is composed of mixtured blood of white, Indian, and negro.  This makes their blood a very great penalty upon the society which assimilates it.  The United States already has sufficient race and blood troubles.
>
> Influx of all types of undesirable aliens and their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization; and instead of our Nation then being the mistress of the world, leading in art, science, invention, finance, statesmanship, culture, and general civilized development, would it not be reasonable to believe that we would assume a secondary place as compared to those nations which have kept their blood white and purely Caucasian? I do not tell you that these things will come to pass, but I do say we already have enough Japanese, Chinese, Italians, Negroes, and other foreign strains.

Ex. F., at 2461-62.

So despite passing the most sweeping immigration law in years, legislators were not happy.  Representative Martin Madden grumbled that the bill "leaves open the doors for perhaps the worst element that comes into the United States—the

Mexican peon."[32]  Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel."[33]  Legislators "proposed bill after bill" restricting Mexican immigration but none could survive opposition from southwestern growers.  Ex. A, at 5.

To solve this problem, a group of key figures began to strategize a new type of immigration bill that would approach immigration from a criminal—rather than a civil—angle.  What resulted was the creation of the crime of "illegal reentry" in the 1929 act, called "the Undesirable Aliens Act of 1929" in the House version.  Enactment of this prohibition served as a compromise between the nativists and the agribusiness interests.  The nativists were happy to have the threat of imprisonment to separate Mexicans and other Latinos from the general population, to avoid the mixing of the races.  The farming interests were happy to have the threat of imprisonment – in addition to the threat of deportation – with which to exploit their Mexican labor supply.  *See Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *12 (finding that the 1929 act "served" these "two racist purposes.").

---

[32] Gonzalez O'Brien, *supra*, n.2 at 32
[33] Exhibit D at H5900.

2.  The Immigration and Nationality Act of 1952.

When Congress re-visited immigration policy in the 1952 Immigration and Nationality Act (INA), racist attitudes persisted.  "[M]any congressmen casually used the racial epithet 'wetback' when the INA was being considered.  Indeed, just before Congress passed the INA, Congress passed a bill that was colloquially known as the 'Wetback Bill.'"  *Id*.  The only mention of the crime of illegal reentry in the consideration of the INA came from a letter submitted by the Department of Justice, which supported a proposed change allowing the prosecution of previously deported immigrants who are "at any time found" in the United States.  The letter from Deputy Attorney General Peyton Ford suggested a further amendment, and elsewhere quoted from a report praising another aspect of the INA because it would "'aid in taking action against the conveyors and receivers of the wetback.'"  Ex. P, pp. 716, 718.  Congress enacted this provision with Ford's suggestion included, without other comment.  The new provision broadened liability for the crime of illegal reentry, re-phrased the prohibition's wording, and located the offense in the United States Code.  *See* Pub. L. 82-414 § 276, 66 Stat. 229 (codified as amended at 8 U.S.C. § 1326).  President Truman vetoed the INA because it 'perpetuate[d]' 'racial or national barriers to naturalization,'" but Congress overrode the veto.  *Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *13.  "For several years after the INA's passage, the United States devoted significant resources to deporting undocumented

15

immigrants from Latin America explicitly named 'Operation Wetback.'"  *Id.* at *9.

        D.  <u>Substantive departures from normal conclusions.</u>

In addition to the overtly racist statements of some legislators during the consideration of the 1929 and 1952 acts, Congress departed from what might be considered "normal" substantive considerations within immigration law, such as economic anxiety about unchecked immigration or even generalized xenophobia. First, the 1920s was the first and only era in which Congress openly relied on the now-discredited theory of eugenics to enact immigration legislation.  Both the 1924 and 1929 immigration laws drew heavily on Dr. Laughlin's debunked beliefs that immigration control was a matter of racial engineering, akin to horse breeding.  And while Congress ultimately acknowledged the discriminatory origins of the National Origins Act of 1924 and repealed it in 1965,[34] illegal reentry remains one of the few laws still in effect from that era.

Second, the racial vitriol expressed during the debates was directed almost exclusively at Mexicans—even though Canadians were also entering the United States in record numbers.  *See* Ex. C, at H3621 (stating that 81,506 Canadians

---

[34] *See* Immigration and Nationality Act of 1965, Pub. L. 89–236, 79 Stat. 911 (abolishing the National Origins Formula); Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 300-301 (1996) (noting Congress's "racial egalitarian motivation" for repealing the National Origins Act).

entered the United States in 1928).  If the 1929 act were motivated by generalized xenophobia or economic anxiety, rather than racism, one would expect legislators to criticize foreigners across the board.  But no legislator referred to Canadians as "mongrels"; none complained of "hordes" of Canadians crossing the border; none objected that Canadians were "poisoning the American citizen."  And Wisconsin Representative John Schafer complained only about *Mexicans* taking jobs, not Canadians. *See* Ex. C, at H3619.

E. <u>Knowledge and foreseeability of the disparate impact.</u>

The history of the crime of illegal reentry between its enactment in 1929 and 1952 allowed Congress to see clearly what impact § 1326 would have when it debated the INA.  As explained above, the burden of the 1929 law fell overwhelmingly on Mexicans, as was its intent, with up to 99% of defendants being Mexican.  With 23 years of experience like this, Congress enacted § 1326 in the INA, expanding the crime's definition.  In the time since, as explained above, § 1326 has disparately impacted Mexicans and other Latinos, as the 1929 act had before.  This disparate impact was made plainly foreseeable by the history that preceded § 1326.

F. <u>The availability of less discriminatory alternatives.</u>

A Congress concerned about economic harms from unregulated immigration, or even a Congress concerned about just plain too many immigrants for whatever reason, would have at its disposal a broad array of race-neutral remedies.  First and

17

foremost, such a Congress could implement a race-neutral quota system for *all* immigrants, limiting the total number of immigrants who may enter the country. Such a Congress could increase the cost of legal immigration across the board, by increasing fees.  A Congress concerned about a particular type of immigrant – say, low-skilled immigrants – could enact laws increasing fees for such immigrants, or requiring a showing of certain valuable skills or education as a condition of entry.

But what Congress did instead, in 1929 and 1952, was target for criminal sanctions only those immigrants who enter without permission.  That is because, as shown above, Congress was uninterested in economic concerns or any other race-neutral concern.  To the contrary, Congress sought to maintain the western states' supply of agricultural labor while ridding the country of any permanent presence of the "peons" and "mongrels" from Mexico, in order to keep pure the country's "'Aryan' stock."  Ex. A at 5.  So rather than take race-neutral measures, it sought the imprisonment of those it knew would be likely to cross the border outside of a port of entry, and those it knew would be likely to have been deported:  Mexicans and other Latinos.

Accordingly, each of the *Arlington Heights* and *Birmingham Ministries* factors favors a finding of intentional discrimination and discriminatory effect.  Considered together, they overwhelmingly show that race was a motivating factor in the passage of the 1929 and 1952 acts.

18

## II.  The reenactment of the statute in 1952 does not cure its unconstitutionality.

To be sure, the original illegal reentry law enacted in 1929 has been reenacted several times, most notably in the INA.  But a law originally enacted with an invidious purpose is not saved from unconstitutionality by a simple reenactment of the same law by a later legislature, or by the passage of time.  *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 (2020) (holding that a Louisiana law providing for non-unanimous juries, designed to dilute the power of black jurors, was unconstitutional under the Sixth Amendment despite a later reenactment without racial animus); *Espinoza v. Montana Dep't of Rev.*, 140 S. Ct. 2246, 2268 (2020) (Alito, J., concurring) (explaining that a law prohibiting the provision of state aid to religious schools, originally enacted out of anti-Catholic bigotry, violates the Establishment Clause even though it was later enacted without religious animus, under *Ramos*).

Just as the passage of time and the reenactment of the laws in *Ramos* and *Espinoza* could not redeem them ex post facto, so too does § 1326 remain tainted by its racist origins.  The law was originally enacted out of animus toward "the Mexican race" and with a goal of maintaining racial "purity."  It was reenacted without material substantive change 23 years later, like the laws in *Ramos* and *Espinoza* were later reenacted.  Much worse than the situations in *Ramos* and *Espinoza*, the law was reenacted amid the casual use of a racial epithet; Department of Justice support for a revision to allow better prosecution of "the conveyors of the 'wetback'"; a

presidential veto raising concerns of racism; and more than two decades of experience demonstrating that a disparate impact would continue. "[O]ur shared respect for 'rational and civil discourse' [cannot] supply an excuse for leaving an uncomfortable past unexamined." *See Ramos*, 140 S. Ct. at 1401 n.44.

Some district courts have upheld § 1326 under *Arlington Heights* on the ground that there is insufficient evidence of Congress's racial animus in the enactment of the INA in 1952, all while finding substantial evidence of racial animus in the 1929 law. *See Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *14-15; *United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567 (D. V.I. Jun. 16, 2021). But these courts misread the relevant precedents, and placed too much emphasis on the INA's stylistic changes. In *Machic-Xiap*, for example, the court gave two reasons for focusing solely on the 1952 INA rather than the 1929 Undesirable Aliens Act. First, the court reasoned that the racial animus of a prior legislature cannot be imputed to a later one, relying primarily on *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). Second, the *Machic-Xiap* court found that § 1326's codification in the 1952 INA was not a "silent reenactment" of the 1929 act. *Machic-Xiap*, __ F. Supp. 3d at __, 2021 WL 3362738, at *14-15.

But the *Machic-Xiap* court misread *Abbott*. There, the 2011 Texas legislature drew congressional district lines that were later found to be discriminatory by a district court. After a remand from the Supreme Court, the district court developed

20

new plans, and the 2013 Texas legislature adopted those redrawn plans "with only very small changes." *Abbott*, 138 S. Ct. at 2325.  Reviewing the 2013 legislature's plan, the district court required the state to *dis*prove the racial animus it found to have existed in the 2011 legislature's plans.  The Supreme Court held that the district court's focus on the 2011 legislature erroneously reversed the challengers' burden to show that the 2013 legislature acted with racial animus.  *Id.*

Crucially, in *Abbott*, the Court distinguished *Hunter*:

> The appellees rely primarily on [*Hunter*], but that case addressed a very different situation.  *Hunter* involved an equal protection challenge to an article of the Alabama Constitution adopted in 1901 at a constitutional convention avowedly dedicated to the establishment of white supremacy.  The article disenfranchised anyone convicted of any crime on a long list that included many minor offenses.  The court below found that the article had been adopted with discriminatory intent, and this Court accepted that conclusion.  The article was never repealed, but over the years, the list of disqualifying offenses had been pruned, and the State argued that what remained was facially constitutional.  This Court rejected that argument because the amendments did not alter the intent with which the article, including the parts that remained, had been adopted.  *But the Court specifically declined to address the question whether the then-existing version would have been valid if "[re]enacted today." Ibid.*

*Id.* (citations to *Hunter* omitted; second alteration in original; emphasis added).

The *Abbott* Court explained that the *Hunter* scenario was not before the Court:

> In these cases, we do not confront a situation like the one in *Hunter*.  Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature.  The 2013 Texas Legislature did not reenact the plan previously passed by its 2011 predecessor.  *Nor did it use criteria that arguably*

21

> carried forward the effects of any discriminatory intent on the part of the
> 2011 Legislature.  Instead, it enacted, with only very small
> changes, plans that had been developed by the Texas court
> pursuant to instructions from this Court "not to
> incorporate . . . any legal defects."

*Id*. (quoting *Perry v. Perez*, 565 U.S. 388, 394 (2012)) (emphasis added).  Far from

barring completely the consideration of a previous legislature's intent, as *Machic-Xiap*

seems to suggest, *Abbott* explained that courts must consider all evidence of

discriminatory intent, past and present together:

> [W]e do not suggest either that the intent of the 2011 Legislature
> is irrelevant or that the plans enacted in 2013 are
> unassailable . . . .  Rather, both the intent of the 2011 Legislature
> and the court's adoption of the interim plans are relevant to the
> extent that they naturally give rise to–or tend to refute–inferences
> regarding the intent of the 2013 Legislature.  They must be
> weighed together with any other direct and circumstantial
> evidence of that Legislature's intent.

*Id*. at 2327.

Here, this Court confronts a scenario unlike those in *Abbott* or *Hunter*.  The act

before this Court is not one that was enacted and then "pruned" through revision, as

was the state constitutional provision at issue in *Hunter*.  *See Abbott*, 138 S. Ct. at

2325.  Nor is it one that was reenacted with material substantive changes, like the

congressional district plans at issue in *Abbott*.  *See also Johnson v. Gov. of State of Fla.*,

405 F.3d 1214, 1223 n.19, 1225 (11th Cir. 2005) (en banc) (upholding Florida's 1968

reenactment of its felon disenfranchisement provision where there was "no evidence

that legislators in 1968 were concerned with or considered the consequences of the

policy along racial lines," and the provision "was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias."). Instead, § 1326 presents a scenario not present in *Hunter*, *Abbott* or *Johnson*. It is a law enacted with racial animus, and then reenacted with the same racial animus and *without* material substantive change by a later Congress, in a manner that "carried forward the effects of [the] discriminatory intent on the part of the" 1929 Congress. *See Abbott*, 138 S. Ct. at 2325.

Considering the evidence of discriminatory intent from 1929 and 1952 together, as *Abbott* requires, the *Arlington Heights* factors demonstrate that § 1326 was enacted with a discriminatory purpose and has a discriminatory effect. The 1929 act was passed with racism as its dominating and primary purpose. Then, for the ensuing 23 years, the law had an overwhelmingly disproportionate impact on Mexicans. Faced with this history, the 1952 Congressional Record is largely silent about illegal reentry outside of Ford's letter of support calling for increased enforcement against the conveyors of the "wetbacks." The same Congress passed the "Wetback Bill" shortly before considering the INA, and then overrode President Truman's veto of the INA, which had accused Congress of perpetuating racism.

Considered in combination, the racial animus behind the original enactment of the federal crime of illegal reentry, the history of the enforcement of that crime between 1929 and 1952, and evidence contemporaneous with the 1952 enactment of

23

the INA demonstrate that § 1326 was enacted with racial animus as a motivating purpose.  The pre-1952 history of illegal reentry *is* the history of the 1952 INA; the 1929 act's pre- and post-enactment history is inseparable from the INA, and *Abbott* requires this Court to consider all relevant evidence together.  Considering all the evidence of discriminatory intent together demonstrates that § 1326 had racial animus as a motivating purpose.  *See Carrillo-Lopez*, slip op. at 17-18 (considering the evidence of discriminatory intent from 1929 along with contemporaneous evidence from 1952 to find § 1326 unconstitutional).

### III.  The Government cannot meet its burden.

Because the *Arlington Heights* and *Birmingham Ministries* factors, considered together, show that racial animus was "a motivating purpose" behind the enactment of § 1326, and because § 1326 had and has a discriminatory effect, the burden shifts to the Government to show that Congress would have enacted § 1326 "even had the impermissible purpose not been considered." *See Arlington Heights*, 429 U.S. at 266–68, 270 n.21; *Hunter*, 471 U.S. at 228 (shifting the burden to the law's defenders to "demonstrate that the law would have been enacted without this factor").

This Court should give the Government the opportunity to make such a showing.  If the Government presents evidence supporting such a showing – or if the Court is not persuaded that Mr. Ferretiz-Hernandez has made a sufficient showing under the first *Arlington Heights* prong on the papers alone – this Court should hold

24

an evidentiary hearing to take expert-witness and other historical and statistical evidence on the enactment of § 1326, and make the necessary findings of fact.  *See Hunter*, 471 U.S. at 229 (relying on trial evidence of state legislative proceedings, including "several historical studies, and the testimony of two expert historians.").  If the Government cannot demonstrate that § 1326 would have been enacted absent the racial animus that was its motivating purpose, the statute is unconstitutional, and this Court should dismiss the indictment.

A. FITZGERALD HALL, ESQ
FEDERAL DEFENDER

*/s **Samuel E. Landes**

Samuel E. Landes, Esq,
D.C. Bar No. 1552625
400 North Tampa Street, Ste. 2700
Tampa, Florida 33602
Email:  Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th of August 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to AUSA Patrick Scruggs.

*/s **Samuel E. Landes**

Samuel E. Landes
Assistant Federal Defender
