UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

      v.                               CASE NO. 8:21-cr-213-RAL-SPF

JORGE CESAR FERRETIZ-HERNANDEZ
  a/k/a "Jorge Cesar Ferretiz"

## GOVERNMENT'S RESPONSE TO
## DEFENDANT'S MOTION TO DISMISS

The United States of America hereby opposes the motion of the Defendant, Jorge Cesar Ferretiz-Hernandez, to dismiss the indictment based on constitutional grounds relating to 8 U.S.C. § 1326 (Doc. 31).

## MEMORANDUM OF LAW

The Court should deny Ferretiz-Hernandez's motion to dismiss for at least three reasons. First, immigration laws are subject to rational-basis review, which, in this case, is a narrow and highly deferential standard of review that Ferretiz-Hernandez cannot overcome. Indeed, with respect to immigration legislation, courts are not permitted to probe the alleged motives of those who passed the challenged law. Moreover, because section 1326 bears an undeniably rational relationship to the government's legitimate interest in enforcing its immigration laws, it passes rational-basis review. Second, even if courts were free to look behind an immigration statute's clearly valid purpose, Ferretiz-Hernandez's challenge to section 1326 would nonetheless fail because it focuses almost entirely on the legislative motives of the 1929 Congress, not the Congress that actually

passed, or repeatedly amended, section 1326. Lastly, Ferretiz-Hernandez has failed to show a cognizable disparate impact.

## I.    Statutory background.

Alien migration to the United States was unrestricted until 1875. *See Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972); *see also Harisiades v. Shaughnessy*, 342 U.S. 580, 588 n.15 (1952). In 1882, Congress passed the first general immigration statute. *Id*. Several other statutes quickly followed, *see id.*, and in 1917, Congress passed legislation requiring deportation of certain aliens who had entered the United States "at any time or place other than as designated by immigration officials,...or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The 1917 law, however, contained no penalty, other than repeated deportation, for reentering the United States after removal. Accordingly, to enhance the deterrent value of our immigration laws, the 70th Congress made reentry after deportation a felony offense punishable by up to two years' imprisonment.[1] *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018; *see also United States v. Corrales-Vazquez*, 931 F.3d 944, 947 (9th Cir. 2019) ("In 1929, Congress decided that aliens who 'enter the United States surreptitiously' should be subject to not only deportation but also criminal penalties, and revised the prohibitions in the 1917

---

[1] The relevant statutory text provided as follows:

"[I]f any alien has been arrested and deported in pursuance of law, he shall be excluded from admission to the United States whether such deportation took place before or after the enactment of this Act, and if he enters or attempts to enter the United States after the expiration of sixty days after the enactment of this Act, he shall be guilty of a felony and upon conviction thereof shall, unless a different penalty is otherwise expressly provided by law, be punished by imprisonment for not more than two years or by a fine of not more than $1,000, or by both such fine and imprisonment."

statute[.]") (internal citation omitted). The Senate Report from the Committee on

Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"]...there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929). The report then set out the parameters of the

proposed illegal-reentry crime, positing that "[i]t is believed that such a statute would be

of material aid in enforcing our immigration laws." *Id.*

The Secretary of the Department of Labor—charged at that time with enforcing

the country's immigration laws—agreed. In a letter included in the Senate Report, the

Secretary stated that the proposed law "would be of material assistance in the

administration of existing immigration laws." *Id.* Continuing, the Secretary noted as

follows:

> It is academic that no prohibitive law can successfully be enforced without a deterrent penalty. The fact that possible deportation is not a sufficient deterrent to discourage those who seek to gain entry through other than regular channels is demonstrated by the frequency with which this department is compelled to resort to deportation proceedings for the same alien on several succeeding occasions....Aside from the sexual immoral and members of the anarchistic and similar cases there is nothing in the immigration laws which penalizes aliens for reentering the United States unlawfully after they have been deported at considerable expense to the Government. The enactment of a law imposing a penalty is recommended.

*Id.*

Over 20 years later, in 1952, the 82nd Congress passed the Immigration and

Nationality Act ("INA"), an act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction); *see also East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) ("In 1952, Congress replaced this disparate statutory scheme with the Immigration and Nationality Act ('INA') which remains the governing statutory framework."); *City & Cty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d 773, 795 (9th Cir. 2019) ("Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952."). In this renewed and comprehensive legislation (codified at 8 U.S.C. § 1 *et seq.*), Congress passed another crime for reentry of a deported alien. The text provided as follows:

> Any alien who (1) has been arrested and deported or excluded and deported, and thereafter (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act, shall be guilty of a felony[.]

*Id.* at § 276, 66 Stat. 229. And, thus, 8 U.S.C. § 1326 was born.

Over the years, Congress has updated section 1326 multiple times—and always to enhance its deterrent value. For instance, in the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to section 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181; *see also United States v. Maul-Valverde*, 10 F.3d 544, 545 (8th Cir. 1993) ("Congress enacted 8 U.S.C. § 1326(b) in 1988 to substantially increase the criminal penalty if an illegally reentering

alien was previously deported following a felony conviction."). Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on removal orders in § 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

Congress's continual strengthening of section 1326's deterrent value "suggests a crystallizing vision on Congress's part of the need for stern punishment in this milieu." *United States v. Dwinells*, 508 F.3d 63, 69 (1st Cir. 2007); *see also United States v. Shill*, 740 F.3d 1347, 1352 & n.5 (9th Cir. 2014). With this statutory backdrop in mind, the United States turns to the merits of Ferretiz-Hernandez's argument.

## II.   Section 1326 passes constitutional muster under rational-basis review.

### A.   Congress's immigration laws are subject to deferential rational-basis review.

Congress's legislative power in the arena of immigration law is plenary: "[O]ver no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (internal citation omitted). Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," *Fiallo*, 430 U.S. at 792, subject only to "narrow judicial review." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102 n.21 (1976); *see also*

*Mathews v. Diaz*, 426 U.S. 67, 82 (1976) (describing the "narrow standard of [judicial] review of decisions made by the Congress or the President in the area of immigration and naturalization"). Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization." *Fiallo*, 430 U.S. at 796 (citing *Mathews*, 426 U.S. at 82). "[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation." *Id.* at 792. This judicial deference applies equally to constitutional questions. *See Othi v. Holder*, 734 F.3d 259, 269 (4th Cir. 2013) ("[N]oting the extraordinarily deferential standard of review that applies in this [immigration] context, even as to constitutional questions."). The Supreme Court and the Eleventh Circuit have reaffirmed these longstanding principles. *See, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2419 (2018) ("[O]ur opinions have reaffirmed and applied [this] deferential standard of review across different contexts and constitutional claims."); *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984) ("Because the political branches share concurrent authority over immigration matters, it follows that both executive and congressional actions are to be regulated by the judiciary according to the same narrow standard of review"), *aff'd*, 472 U.S. 846 (1985).

Under governing Supreme Court doctrine, this "deferential standard of review" is limited to considering whether the challenged law is "facially legitimate and bona fide." *Mandel*, 408 U.S. at 769. In *Mandel*, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford University. *Id.* at 756-57. The professors who wished to hear the journalist challenged that decision under

6

the First Amendment. *Id.* at 764-65. Although the Supreme Court acknowledged that the challengers' constitutional "right to receive information" was implicated, it nonetheless limited its review to whether the Executive had given a "facially legitimate and bona fide" reason for its action. *Id.* at 764-65, 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. *Id.* at 770. And, in holding as such, the Court declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham." *Id*. at 778 (Marshall, J., dissenting). The Supreme Court continues to apply *Mandel*'s instruction. *See Kerry v. Din*, 576 U.S. 86, 105 (2015) ("*Mandel* instructs us not to 'look behind' the Government's exclusion of" the alien) (Kennedy, J., concurring); *see also Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) (*Din* "left things as *Mandel* had left them," and "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation").

The Supreme Court later confirmed that *Mandel*'s deferential test applies equally to congressional decision-making. In *Fiallo*, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy. In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad

congressional policy choice at issue…under a more exacting standard than was applied in *Kleindienst v. Mandel*, a First Amendment case." *Id.* at 795. In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." *Id.* at 799 (quotation omitted). The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." *Id.*; *see also Trump*, 138 S. Ct. at 2419 (citing *Fiallo*'s principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

The Supreme Court continues to apply rational-basis review to immigration-related challenges, *Trump*, 138 S. Ct. at 2420, and it has described that standard as one providing for "minimal scrutiny." *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017). And, in the Eleventh Circuit, *Mandel* and *Fiallo*'s "facially legitimate and bona fide" test requires courts to apply rational-basis review when considering matters of immigration and naturalization. As the Eleventh Circuit has explained, certain federal classifications that distinguish among groups of aliens are subject only to rational-basis review. *Resendiz–Alcaraz v. Ashcroft*, 383 F.3d 1262, 1271 (11th Cir. 2004); *see also Poveda v. U.S. Att'y Gen.*, 692 F.3d 1168, 1172 (11th Cir. 2012). In other words, when a federal statute discriminates among *categories* of aliens (such as those who have entered the country lawfully versus those who have entered unlawfully), instead of against aliens *generally*, the statute is subject to rational-basis review, as opposed to heightened or strict scrutiny. *See Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1347-48 (11th Cir. 1999); *see also United States v. Osorto*, 995 F.3d 801, 811 (11th Cir. 2021) ("while state laws that discriminate

8

against noncitizens are subject to strict scrutiny under the Fourteenth Amendment[,]…
federal laws that discriminate against noncitizens must pass only rational-basis scrutiny
under the Fifth Amendment") (citation omitted).

Ferretiz-Hernandez's argument that rational-basis review does not apply here is
merely wishful thinking. He claims that the protected class at issue does not involve
alienage, but, rather, race. Section 1326, however, expressly targets a subset of *aliens* (i.e.,
those who reentered the country unlawfully after removal), and it says nothing about the
race of those aliens. Indeed, although Ferretiz-Hernandez discusses the impact of the
statute on Mexicans and Latinos, its provisions clearly apply to any individual, of any
nationality or ethnicity, who unlawfully reenters the country after removal—be they from
Mexico, Canada, or anywhere else. Therefore, by its own terms, section 1326 does not
employ any racial classifications, and so rational-basis review applies.

**B.    Section 1326 satisfies rational-basis review.**

"Rational basis scrutiny is a highly deferential standard that proscribes only the
very outer limits of a legislature's power." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir.
2001). A statute is constitutional under rational basis scrutiny so long as "there is any
reasonably conceivable state of facts that could provide a rational basis for the" statute. *Id.*
(quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993)). The test is met where "there is
a rational relationship between the disparity of treatment and some legitimate
governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The government "has no
obligation to produce evidence to sustain the rationality of a statutory classification." *Id.*
Instead, the "burden is on the one attacking the legislative arrangement to negative every

conceivable basis which might support it[.]" *Id.* "Only in an exceptional circumstance will a statute not be rationally related to a legitimate government interest and be found unconstitutional under rational basis scrutiny." *Pryor*, 240 F.3d at 948.

The government has a legitimate interest in deterring aliens from illegally reentering the United States. The relationship between that interest and section 1326—which provides sanctions for repeated violations of United States immigration law—is clear. It is also plainly rational. *See, e.g., Abebe v. Mukasey*, 554 F.3d 1203, 1207 n.6 (9th Cir. 2009) ("[F]ederal power is at its zenith" in immigration setting); *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) ("[I]t is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite."); *United States v. Henry*, 111 F.3d 111, 114 (11th Cir. 1997) ("Section 1326 is not based upon any common law crime but is a regulatory statute enacted to assist in the control of unlawful immigration by aliens.") (citation omitted); *United States v. Cupa-Guillen*, 34 F.3d 860, 863 (9th Cir. 1994) ("[T]here is a strong societal interest in controlling immigration and in effectively policing our borders. This interest is furthered by enhancing punishment against persons who illegally enter the country after having previously committed aggravated felonies."); *United States v. Barron-Rivera*, 922 F.2d 549, 555 (9th Cir. 1991) ("8 U.S.C. § 1326 is designed to effectively enforce the immigration laws").

Because section 1326's purpose is plainly legitimate and inextricably linked to the government's undeniable interest in enforcing its immigration laws, the statute easily

passes that "minimal [form of] scrutiny," *Morales-Santana*, 137 S. Ct. at 1693, known as rational- basis review. *See Resendiz-Alcaraz*, 383 F.3d at 1271-72. As noted above, under rational-basis review, the government has no obligation to produce evidence to sustain the rationality of the challenged law. *See Heller*, 509 U.S. at 320. To the contrary, the burden of negation lies with the challenger. *See id*. Here, however, Ferretiz-Hernandez has failed to even attempt such a showing. As such, his challenge to section 1326 fails under rational-basis review. This would be true with regard to ordinary statutes, but it is especially so with regard to section 1326, a statute deriving from Congress's plenary immigration powers.

The government's interest in regulating immigration is centuries old. The Supreme Court recognized as much at least as far back as 1893: "The right to exclude or to expel all aliens, or any class of aliens, absolutely or upon certain conditions, in war or in peace, being an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare[.]" *Fong Yue Ting v. United States*, 149 U.S. 698, 711 (1893). The right of a sovereign to criminally sanction those illegally within its borders is of a similar vintage. *See Wong Wing v. United States*, 163 U.S. 228, 235 (1896) ("[I]t would be plainly competent for Congress to declare the act of an alien in remaining unlawfully within the United States to be an offence punishable by fine or imprisonment…."). Section 1326, therefore, easily satisfies rational-basis review.

Ferretiz-Hernandez's inability to successfully challenge section 1326 under rational-basis review is to be expected. As the Supreme Court recently stated, "[I]t should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under

rational basis scrutiny." *Trump*, 138 S. Ct. at 2420. "On the few occasions where we have done so," the Court continued, "a common thread has been that the laws at issue lack any purpose other than a bare…desire to harm a politically unpopular group." *Id.* (internal quotation marks and citation omitted). That is clearly not the case with section 1326—a law seeking to deter *all* aliens from unlawfully reentering the country following removal. The statute's relationship to its goal—one which is at the core of sovereignty, *see Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("The power to admit or exclude aliens is a sovereign prerogative" (alteration omitted))—is beyond question. And, to the extent that this Court needed further proof of the statute's rational relationship to its goal of deterrence and enforcement, Ferretiz-Hernandez's prior removals and subsequent reentries, as well as his prior drug-trafficking conviction, is evidence enough. *See United States v. Crews*, 495 F. App'x 36, 38 (11th Cir. 2012) ("The government has a legitimate interest in 'prevent[ing] repeat offenders from continuing to victimize society.'") (quoting *United States v. Johns*, 984 F.2d 1162, 1164 (11th Cir. 1993)).

For the reasons explained above, section 1326 satisfies rational-basis review. Ferretiz-Hernandez's equal-protection claim, therefore, fails.

## III. Ferretiz-Hernandez has failed to satisfy the requirements of *Arlington Heights*.

Notwithstanding the above, Ferretiz-Hernandez insists that section 1326 violates equal protection based on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). That case, which involved a rezoning request to accommodate the placement of low-income housing, is inapplicable for two reasons. First, Ferretiz-Hernandez fails to cite any case in the Supreme Court or the Eleventh Circuit applying

the rubric of *Arlington Heights* to immigration laws passed by Congress. And for good reason: the expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role...to probe and test the justifications for the legislative decision." *Fiallo*, 430 U.S. at 799. *Arlington Heights* invites inquiry into "circumstantial and direct evidence of intent," the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," and the "legislative or administrative history." 429 U.S. at 267-68. Such an inquiry cannot be squared with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking. *Accord Trump*, 138 S. Ct. at 2420 n.5 (criticizing "the dissent's assumption that courts should review immigration policies...under the de novo 'reasonable observer' inquiry applicable to cases involving holiday displays and graduation ceremonies.").

But even if that were not the case—and the Court could, in fact, probe the motives of the legislators who passed the challenged immigration law—Ferretiz-Hernandez's challenge would still fail. This is because nearly the entirety of Ferretiz-Hernandez's equal-protection argument hinges on the motives of a handful of Congressmen involved in the passing of section 1326's predecessor statute in 1929. Putting aside the fact that "it is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind a legislative enactment[,]" *Palmer v. Thompson*, 403 U.S. 217, 224 (1971), Ferretiz-Hernandez's challenge fails because it is levelled at the wrong set of legislative motives.

In *Washington v. Davis*, 426 U.S. 229 (1976), the Supreme Court made it clear that

13

official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.* at 242. Rather, proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. *Arlington Heights*, 429 U.S. at 265. While a moving party need not prove that the challenged action rested solely on racially discriminatory purposes, determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into circumstantial and direct evidence of intent. *Id.* at 265-66. In *Arlington Heights*, the Court identified a non-exhaustive list of the subjects of proper inquiry in determining whether racially discriminatory intent existed, which Ferretiz-Hernandez sets forth in his motion (Doc. 31 at 5). *See id.* at 267-68; *see also Greater Birmingham Ministries v. Sec'y of State for State of Alabama*, 992 F.3d 1299, 1321-22 (11th Cir. 2021).

As addressed above, the governing statutory framework of United States immigration law was enacted in 1952, when Congress replaced prior disparate statutes with the comprehensive INA. *See* Pub. L. No. 82-414, 66 Stat. 163 (codified as amended at 8 U.S.C. § 1 *et seq.*); *see also East Bay Sanctuary Covenant*, 932 F.3d at 756. Moreover, in addition to enacting section 1326 in 1952, Congress has updated or modified the statute multiple times since, including in 1988, 1990, 1994, 1996, and 1997. Each time Congress did so, it strengthened the law. Ferretiz-Hernandez has presented no argument or evidence with regard to these subsequent enactments. Such omissions are fatal to his

claim, which, as explained in greater detail below, falters for factual reasons.[2]

In Ferretiz-Hernandez's recounting, the history of section 1326 essentially ended in 1929. But section 1326 did not even exist then, and Congress has repeatedly revisited the statute since its enactment later, in 1952. Ferretiz-Hernandez's near-exclusive focus on legislators' comments from the 1920s sheds little light on a statute that was conceived in 1952 and has been amended many times since.[3]  According to Ferretiz-Hernandez, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. But whether intentional discrimination existed in 1929 legislation is a question about the motives of the 1929 legislature. Legislative intent, however, is not an artifact that "carr[ies] over" from one law to the next. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); *cf. Palmer*, 403 U.S. at 225 ("[T]here is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters. If the law is struck down for this reason,

---

[2] Even if Ferretiz-Hernandez's equal-protection argument were properly framed, the import of any legislative animus, assuming such evidence existed and could be considered, would likely be greatly diminished. *Accord Trump*, 138 S. Ct. at 2418 ("[T]he issue before us is not whether to denounce the [President's] statements. It is instead the significance of those statements in reviewing a Presidential directive, neutral on its face, addressing a matter within the core of executive responsibility. In doing so, we must consider not only the statements of a particular President, but also the authority of the Presidency itself."); *see also id.* at 2421 ("The Proclamation is expressly premised on legitimate purposes: preventing entry of nationals who cannot be adequately vetted and inducing other nations to improve their practices. The text says nothing about religion.").

[3] By 1952, the congressmen cited in Ferretiz-Hernandez's motion and exhibits had either left the Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John Schafer) or were no longer alive (Coleman Blease, John Box, Harry Laughlin). James Davis, the Secretary of Labor from 1921 to 1930, passed away in 1947.

15

rather than because of its facial content or effect, it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons"). As the Supreme Court has put it in a different context:

> It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. *We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it.*

*United States v. O'Brien*, 391 U.S. 367, 384 (1968) (emphasis added).

Viewed accordingly, even assuming that *Arlington Heights* applies here, it would get Ferretiz-Hernandez only so far. First, even when a court finds that prior discrimination was recent, "[t]he ultimate question" under *Arlington Heights* must be "whether a discriminatory intent has been proved in [the] given case"—that is, for the particular challenged enactment. *City of Mobile*, 446 U.S. at 74. Here, the discriminatory intent cited by Ferretiz-Hernandez is neither recent—preceding § 1326 by more than two decades— nor proven in the "given case" (i.e., the 1952 statute or any of its subsequent versions). While it is true that, under *Arlington Heights* "legislative or administrative history may be highly relevant," the Supreme Court has specified that this is especially so "where there are *contemporary* statements by members of the decision making body[.]" *Arlington Heights*, 429 U.S. at 268 (emphasis added); *see also id.* at 267 (focusing the Court's "historical background" analysis on the "specific sequence of events leading up to the challenged decision"). The Court's most recent application of *Arlington Heights* bears this out. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1916 (2020)

(plurality opinion) ("[T]hese statements—remote in time and made in unrelated contexts—do not qualify as 'contemporary statements' probative of the decision at issue.") (quoting *Arlington Heights*, 429 U.S. at 268).

Second, even if this Court were to conduct a motive-probing inquiry under *Arlington Heights* and conclude that a discriminatory purpose was a substantial or motivating factor behind the 1929 immigration law's enactment, the burden would then shift to the law's defenders to demonstrate that the law would have been enacted without this factor. *See Greater Birmingham Ministries*, 992 F.3d at 1321 (citations omitted). That burden is easily met here, where the law has a clear rational basis (especially given continued, and increasing, migration to the United States since 1929)[4] and where Ferretiz-Hernandez barely attempts to challenge Congress's 1952 enactment of section 1326, let alone any of its subsequent modifications. Indeed, we need not speculate that the law *would have been* enacted; it was in 1952, and then it was revised several times over. So, even if we accept the worst about the original Congress that enacted the 1929 legislation, section 1326 would still not violate principles of equal protection. Congress's repeated efforts—over the course of multiple decades—to strengthen the law against unlawful reentry underscores the implausibility of Ferretiz-Hernandez's claim that Congress has been acting out of a discriminatory animus, rather than seeking to address the lasting, and difficult, problem of illegal immigration.

To the extent that Ferretiz-Hernandez tries to directly attack the legislature that

---

[4] *See Modern Immigration Wave Brings 59 Million to U.S., Driving Population Growth and Change Through 2065; Chapter 5: U.S. Foreign-Born Population Trends*, PEW RESEARCH CENTER, Sept. 28, 2015, https://www.pewresearch.org/hispanic/2015/09/28/chapter-5-u-s-foreign-born-population-trends/.

enacted the 1952 INA, his evidence of discriminatory intent is sparse. Ferretiz-Hernandez devotes a single paragraph of his motion to the enactment of the 1952 INA, because there is insufficient evidence to demonstrate that racial animus underpinned its passage. Doc. 31 at 15-16. Ferretiz-Hernandez mentions that unspecified congressmen may have "casually used the racial epithet 'wetback' when the INA was being considered." *Id.* at 15. He also points to a single letter, not from a member of Congress, but from the then-Deputy Attorney General, that included the term "wetback." *Id.* But the greater picture shows that Congress actually sought to remove racial bars to immigration with the INA. Although there may have been "problematic rhetoric" by seven senators who proposed the so-called "wetback amendment" during debate preceding the override of President Truman's veto, *see United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567, at *7 (D.V.I. June 16, 2021) (citing 82 Cong. Rec. 8122 (June 26, 1952)), that amendment was voted down by a count of 11 to 65. 82 Cong. Rec. 8123 (June 26, 1952). Meanwhile, as the Act went to a vote on whether to override President Truman's veto, Congressman Francis Walter proclaimed on the floor:

> The message before us points to many good and desirable provisions of the bill. Among them it lists the removal of racial barriers to immigration and naturalization; the removal of discriminations between sexes, and other improvements of the existing law. If the President's veto is sustained, none of these improvements will be written into law.

82 Cong. Rec. 8215 (June 26, 1952). Congressman Walter Judd later echoed this sentiment, stating:

> I submit that it is the President's veto that repudiates our basic religious concepts, our belief in the brotherhood of man, because it keeps our statutes as they are, with hundreds of millions of people in those crucial areas still outlawed because of the color or the pigment of their skin....We must make clear to watching millions that

the representatives of the people of the United States believe in trying to correct things that are inequitable; that we want to improve relations between our country and all the peoples in the world who want to be free[.]

82 Cong. Rec. 8218 (June 26, 1952). Ferretiz-Hernandez suggests that President Truman's veto was motivated by concerns about the Act's racial animus, but these comments show otherwise. Indeed, Congress was striving to remove racial barriers to immigration by passing the Act. Moreover, when Congress overrode President Truman's veto, every senator who had argued for the "wetback amendment" voted against the veto override, thereby "rendering whatever discriminatory purpose those eleven may have held inapplicable to the Act's passage." *Wence*, 2021 WL 2463567, at *8 (citing 82 Cong. Rec. 8267 (June 27, 1952)). Put simply, Ferretiz-Hernandez's attempt to paint the 1952 statute with the same brush as the 1929 enactment fails. He cannot show that the same racial animus that may have motivated Congress in 1929 also led it to pass the INA in 1952.

What's more, the way in which later congressional enactments undermine Ferretiz-Hernandez's argument accords with post-*Arlington Heights* cases. Such cases recognize, for example, that, while the historical background of a decision is one source of evidence of intentional discrimination under *Arlington Heights*, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). "Although the history of racial discrimination in this country is undeniable, we cannot accept official actions taken long ago as evidence of current intent." *Id.* Other post-*Arlington Heights* cases have viewed variants of the "taint argument" with equal skepticism. For example, in *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Development Commission*, the Supreme

19

Court held as follows:

> [P]etitioners note that Proposition 15, the initiative out of which § 25524.2
> arose, and companion provisions in California's so-called nuclear laws, are
> more clearly written with safety purposes in mind. It is suggested that §
> 25524.2 shares a common heritage with these laws and should be presumed
> to have been enacted for the same purposes. The short answer here is that
> these other state laws are not before the Court, and indeed, Proposition 15
> was not passed; these provisions and their pedigree do not taint other parts
> of the Warren-Alquist Act.

461 U.S. 190, 215-16 (1983). And, most recently, in *Abbott v. Perez*, the Court explained

that "the presumption of legislative good faith [is] not changed by a finding of past

discrimination." 138 S. Ct. 2305, 2324 (2018). In so holding, the Court reiterated its

almost 40-year-old statement that "[p]ast discrimination cannot, in the manner of original

sin, condemn governmental action that is not itself unlawful." *Id.* (quoting *City of Mobile*,

446 U.S. at 74). Indeed, the Court ultimately held that in assessing an equal-protection

challenge, the relevant focus must be on the legislature that *actually* enacted the

challenged law or policy, not on earlier legislatures:

> The 2013 Texas Legislature did not reenact the [redistricting] plan
> previously passed by its 2011 predecessor. Nor did it use criteria that
> arguably carried forward the effects of any discriminatory intent on the part
> of the 2011 Legislature….Under these circumstances, there can be no doubt
> about what matters: It is the intent of the 2013 Legislature. And it was the
> plaintiffs' burden to overcome the presumption of legislative good faith and
> show that the 2013 Legislature acted with invidious intent.

*Id.* at 2325.

Taken collectively, this trio of cases counsels strongly in favor of rejecting Ferretiz-

Hernandez's attempt to shoehorn legislative history from the 1920s into the 1952 INA or

the present-day version of section 1326. As in *McCleskey*, Ferretiz-Hernandez's evidence

from the 1920s "has little probative value" for understanding Congress's motivation for

enacting section 1326 in 1952, to say nothing of its intent in 1988, 1990, 1994, 1996, or 1997. 481 U.S. at 298 n.20. Similarly, and more fundamentally, *Pacific Gas & Elec. Co.* instructs that viewing section1326 through the lens of its possible predecessor statute makes little conceptual sense, as the 1929 statute is simply "not before the Court[.]" 461 U.S. at 215-16. And, finally, *Abbott* reinforces the intuitive approach set forth in the Court's prior decisions in *City of Mobile* and *Pacific Gas & Elec. Co.* that legislative intent is not indelibly ingrained in statutory text and that, in weighing the motives of legislators in the context of an equal protection challenge, a court's focus should always be on the legislature that passed the challenged law, not on earlier legislatures. 138 S. Ct. at 2324-25.[5]

With these principles in mind, it should be noted that courts of appeals have rejected the "forever tainted" argument that Ferretiz-Hernandez urges. For example, in *United States v. Johnson*, the D.C. Circuit rejected an argument that is conceptually identical to Ferretiz-Hernandez's. 40 F.3d 436 (D.C. Cir. 1994). There, the defendants

---

[5] Ferretiz-Hernandez cites the Supreme Court's recent decision in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), as supporting the propriety of consulting a progenitor law's legislative history in assessing the constitutionality of a now-existing law. Doc. 31 at 19-20. Such reliance is misplaced. The question presented in *Ramos* was whether a state law allowing non-unanimous jury verdicts in criminal trials was constitutional. *Id.* at 1392. The Court held that the Sixth Amendment right to a jury trial "requires a unanimous verdict to convict a defendant of a serious offense." *Id.* at 1394. While it is true that the Court noted that laws requiring non-unanimous verdicts in criminal cases were rooted in racism, the Court's fundamental holding was not that such laws are unconstitutional due to their past, but that the Sixth Amendment demanded unanimity in criminal trials. *See id.* at 1397 ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."). *Ramos* was not an equal-protection case and never applied, or even cited, *Arlington Heights*. In fact, in explaining its acknowledgment of the racist history of non-unanimous jury laws, the Court stated that it did so as part of the "functional" analysis required by the Sixth Amendment. *See id.* at 1401 n.44. As such, *Ramos* provides no support for Ferretiz-Hernandez's attempt to invalidate section 1326.

challenged 21 U.S.C. § 841(b) (enacted as part of the Anti–Drug Abuse Act of 1986) on

the grounds that its "sentencing scheme violates the equal-protection component of the

Fifth Amendment by disproportionately and invidiously impacting blacks through meting

out of harsher penalties for offenses involving crack cocaine[.]" *Id*. at 439. The defendants

pointed to racist legislative statements made during debates preceding a 1914 statute that

criminalized cocaine trafficking. *Id*. at 440. The D.C. Circuit rejected this line of attack,

noting the following:

> Appellants urge us to ascribe a discriminatory intent to Congress based on
> rather sketchy and unpersuasive bits of information. They point first to the
> undeniable racism that animated legislative debate leading to the passage of
> a 1914 statute criminalizing cocaine trafficking generally, long before the
> crack/powder distinction was contemplated. We think this information is of
> no relevance to our inquiry into the motives of the Congress that passed the
> 1986 Act.

*Id*. (citing *McCleskey*, 481 U.S. at 298 n.20). Concluding, the *Johnson* court observed that

"it would be anomalous to attempt to tar the present Congress with the racist brush of a

pre-World War I debate." *Id*. Echoing *Johnson*, the Ninth Circuit also rejected a like

challenge to § 841(b):

> In support of his discriminatory purpose argument, Dumas points to the
> racism which permeated the legislative debates leading to enactment of the
> Harrison Act of 1914, the first federal law to criminalize cocaine.
>
> The crack/powder cocaine sentencing distinction was adopted in 1986, with
> the passage of the Anti-Drug Abuse Act. The changes which occurred in
> American society between 1914 and 1986-changes brought about in part by
> successive Congresses and by the impact of the Voting Rights Act on the
> makeup of Congress itself-make it "anomalous" to ascribe to the 1986
> Congress the racism of the Congress of 1914.

*United States v. Dumas*, 64 F.3d 1427, 1430 (9th Cir. 1995) (citing *Johnson*, 40 F.3d at 440).

The principles that *Johnson* and *Dumas* applied in the criminal context have been

22

applied by courts of appeals in civil cases as well. In doing so, these courts have recognized that when a state reenacts, for example, a voting provision that was originally intentionally discriminatory, the ultimate focus in subsequent litigation is on the intent of the reenacting legislature, not the original one. *See, e.g., Johnson v. Governor*, 405 F.3d 1214, 1223-24 (11th Cir. 2005) (en banc) (addressing felon-disenfranchisement law); *Hayden v. Patterson*, 594 F.3d 150, 166-67 (2d Cir. 2010) (same); *Chen v. City of Houston*, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim). For example, in considering a challenge to a voter-identification law based on the discriminatory intentions of several Alabama legislators, the Eleventh Circuit rejected the notion that the plaintiffs could prove discriminatory intent through legislative statements having nothing to do with the challenged law. *See Greater Birmingham Ministries*, 966 F.3d at 1228. As it stated:

> When we focus on the circumstances surrounding the passage of HB19, it is undisputed that none of the comments in question were made about that legislation. The statements made by current and former Alabama legislators at issue in this case are not "smoking gun" evidence of discriminatory intent in the context of the voter ID law. The fact remains that Plaintiffs cannot point to evidence—not a single comment made by any sitting Alabama legislator in reference to HB19—to support their argument that the voter ID law was intended to discriminate against black and Latino voters.

*Id.* Continuing, the Eleventh Circuit concluded:

> We are mindful of the danger of allowing the old, outdated intentions of previous generations to taint Alabama's legislative action forevermore on certain topics. Plaintiffs point to the racist history of Alabama as a significant barrier for Secretary Merrill to overcome in defending this law. But it cannot be that Alabama's history bans its legislature from ever enacting otherwise constitutional laws about voting.

*Id.* at 1228–29. Meanwhile, the Second Circuit has reasoned similarly:

> Given this substantive amendment to New York's constitutional provision and the lack of any allegations by plaintiffs of discriminatory intent "reasonably contemporaneous with the challenged decision," *McCleskey*, 481 U.S. at 298 n. 20, we cannot hold that plaintiffs state a plausible claim of intentional discrimination as to the 1894 constitutional provision, which is the bridge necessary for plaintiffs to sufficiently trace any disparate impact of New York Election Law § 5–106(2) "to a purpose to discriminate on the basis of race," *Feeney*, 442 U.S. at 260, 99 S.Ct. 2282.

*Hayden*, 594 F.3d at 167. And, other courts are in accord. *See, e.g.*, *Johnson v. Governor*, 405 F.3d at 1223-24; *Chen*, 206 F.3d at 520-521; *Cotton v. Fordice*, 157 F.3d 388, 391-92 & n.7 (5th Cir. 1998); *accord Riddick by Riddick v. Sch. Bd. of City of Norfolk*, 784 F.2d 521, 539 (4th Cir. 1986) ("We reject plaintiffs' argument that the Norfolk school board must continue to justify all of its actions because of the history of segregation. While that history of discrimination cannot and should not be ignored, it 'cannot in the manner of original sin, condemn governmental action that is not itself unlawful.'") (quoting *City of Mobile*, 446 U.S. at 74). And, like the Supreme Court recently held, *see Abbott*, 138 S. Ct. at 2325 ("we have never suggested that past discrimination flips the evidentiary burden on its head"), these courts have also rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made. *Johnson v. Governor*, 405 F.3d at 1223; *Hayden*, 594 F.3d at 166-67; *accord Cotton*, 157 F.3d at 392.

This line of cases makes eminent sense. In any challenge to a statute, the critical focus must be on the contested law itself, not its two-decade-old predecessor. Divining the intent of a particular legislature is a difficult enough enterprise. The Supreme Court has described it as "a problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and "a hazardous matter," *O'Brien*, 391 U.S. at 383. Attempting to ascertain the intent of a Congress from 1929 and then imputing it—with virtually no supporting

evidence—to a Congress from 1952 (or from 1988, 1990, 1994, 1996, or 1997), is not only "problematic" or "hazardous"—it is illogical. This Court, therefore, should decline Ferretiz-Hernandez's invitation to participate in this undertaking.[6]

## IV.  Ferretiz-Hernandez cannot demonstrate a cognizable disparate impact.

As explained above, Ferretiz-Hernandez has failed to show sufficient discriminatory animus on the part of the Congress that *actually* passed (or subsequently modified) section 1326. Moreover, Ferretiz-Hernandez cannot demonstrate a cognizable disparate impact. Ferretiz-Hernandez cites the higher percentage of section 1326 prosecutions of Mexican and Hispanic defendants as proof of disparate impact and

---

[6] To the government's knowledge, to date, only five district courts have addressed the precise challenge presented in Ferretiz-Hernandez's motion. Four of those courts have rejected it. *See United States v. Machic-Xiap*, — F. Supp. 3d —, No. 3:19-CR-407-SI, 2021 WL 3362738, at *15 (D. Or. Aug. 3, 2021) ("[T]he fact that racial prejudice played an invidious and overwhelming role in the creation of the Undesirable Aliens Act of 1929 does not compel the Government today to prove that Congress expressly disavowed all prior improper motives when defending a later-enacted law against an equal protection challenge, even when the historical foundation of the current law can be traced back to the earlier statute."); *Wence*, 2021 WL 2463567, at *9 ("[T]he extensive deliberative processes undertaken by Congress in 1952 and 1990, combined with the lack of legislative history directly addressing 8 U.S.C. § 1326, illuminates the absence of proof of the 82nd and 101st Congresses' discriminatory intent."); *United States v. Palacios Arias*, No. 3:20-cr-62-JAG, ECF No. 37 at 6 n.7 (E.D. Va. Oct. 13, 2020) ("Even assuming, however, that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later."); *United States v. Morales-Roblero*, 2020 WL 5517594, at *9 (S.D. Cal. Sept. 14, 2020) ("Defendant's *Arlington Heights* analysis of § 1325(a)(1) is fatally flawed, however, because it relies entirely on legislative history from the 1920s, decades before § 1325(a)(1) was enacted."); *see also id*. at *10 ("There is no support for Defendant's suggestion that § 1325(a)(1) should be judged according to legislative history from laws enacted decades before, and Defendant has not attempted to argue that § 1325(a)(1) would be unconstitutional under an *Arlington Heights* analysis of relevant legislative history."). One court has accepted Ferretiz-Hernandez's argument. *See United States v. Carrillo-Lopez*, No. 320CR00026MMDWGC, 2021 WL 3667330, at *25 (D. Nev. Aug. 18, 2021) ("[T]he government has failed to establish that a nondiscriminatory motivation existed in 1952 for reenacting Section 1326 that exists independently from the discriminatory motivations, in either 1929 or 1952."). The government has filed a notice of appeal from the decision in *Carrillo-Lopez*.

discrimination. Doc. 31 at 6-8. But it is not. As a threshold matter, section 1326 applies to any alien who reenters the United States illegally. The statute makes no distinctions based on particular nationality or race, and such laws are presumptively compliant with equal protection principles. *See Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause.") (internal quotation marks and citation omitted).[7]

In any event, the statistics that Ferretiz-Hernandez cites are the product of geography, not discrimination. For instance, in Fiscal Year 2020, Customs and Border Protection logged 405,036 total "encounters." *See* https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics. Ninety-nine percent of those encounters (400,651) occurred on the Southwest border. *See* https://www.cbp.gov/newsroom/stats/sw-border-

---

[7] For this reason, section 1326 does not fit the mold of statutes traditionally challenged on equal-protection grounds based on group classifications. To be sure, this is not to say that Congress could not pass a law that distinguishes, to a greater degree, between United States nationals and non-nationals; it could. The Hostage Taking Act, 18 U.S.C. § 1203, for example, classifies offenders and victims on the basis of alienage, yet no court of appeals has found this classification scheme violative of the Equal Protection Clause. *See, e.g.*, *United States v. Ferreira*, 275 F.3d 1020, 1027 (11th Cir. 2001); *United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000); *United States v. Santos–Riviera*, 183 F.3d 367, 373–74 (5th Cir. 1999); *United States v. Lue*, 134 F.3d 79, 87 (2d Cir. 1998); *United States v. Lopez–Flores*, 63 F.3d 1468, 1475 (9th Cir. 1995). To the extent that section1326 resembles section 1203's alienage classification, Congress's power to enact the former statute is likely on even surer footing. It is well established that Congress, acting pursuant to its immigration power, may make rules applicable to aliens that "would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 79–80. Section 1203, however, was not enacted under Congress's immigration power, although it is closely related thereto. *See Lopez–Flores*, 63 F.3d at 1473. It therefore stands to reason that if section 1203's classification scheme has survived numerous equal protection challenges, then section 1326, which "Congress possessed ample authority to enact...pursuant to its inherent immigration power," and which "is well within the ambit of Congress's sweeping power over immigration matters[,]" *Hernandez-Guerrero*, 147 F.3d at 1078, would clearly survive such a challenge. *Accord Osorto*, 995 F.3d 801, 811; *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007) (USSG § 2L1.2's 16-level enhancement for those who violate section 1326 does not violate Equal Protection Clause, despite punishing illegal reentrants more severely than other felons with same criminal records).

migration-fy2020; *see also Arizona v. United States*, 567 U.S. 387, 397 (2012) ("Arizona bears many of the consequences of unlawful immigration. Hundreds of thousands of deportable aliens are apprehended in Arizona each year."). Those numbers are neither surprising nor illuminating of Congress's motives, whether in the 1920s or any other decade. Indeed, if it were enough to state an equal-protection claim that a broad-scale immigration law disparately impacted individuals of any particular ethnicity or nationality—including those from a country sharing 1,954 miles of border with the United States—countless laws could be challenged on that ground. In fact, the Supreme Court recently rejected just this sort of equal-protection claim, holding that the disparate impact caused by the rescission of Deferred Action for Childhood Arrivals ("DACA") on Hispanics from Mexico—totaling 78 percent of DACA recipients—did not establish a plausible equal-protection claim "because Latinos make up a large share of the unauthorized alien population, [and] one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program." *See Regents*, 140 S. Ct. at 1915. Continuing, the Court noted that, "[w]ere this [statistical] fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id*. at 1916.[8]

---

[8] Applying the logic of *Regents*, the Ninth Circuit recently rejected an equal-protection claim that the Secretary of Homeland Security's decision to terminate Temporary Protective Status ("TPS") designations for Sudan, Nicaragua, Haiti, and El Salvador was motivated by racial animus toward "non-white, non-European" immigrants. *Ramos v. Wolf*, — F.3d —, 2020 WL 5509753, at *19 (9th Cir. Sept. 14, 2020). In so holding, the court noted that "virtually every country that has been designated for TPS since its inception has been 'non-European' (with the exception of Bosnia and the Province of Kosovo) and most have majority 'non-white' populations." *Id*. As such, it concluded that it "cannot be the case" that "almost any TPS termination in the history of the program would bear 'more heavily' on 'non-white, non-European' populations and thereby give rise to a potential equal protection claim." *Id*. (citing *Regents*, 140 S. Ct. at 1915).

The Ninth Circuit has rejected just this sort of statistics-based argument in the context of affirming the denial of a motion to compel discovery with regard to a selective-prosecution claim. As it held:

> Simplified, Sullivan's proposition is that selective prosecution may be inferred because 94.5% of § 1326 defendants are Hispanic males, while only 89% of persons deported from the United States are Hispanic. This statistic is probative of the treatment of similarly situated individuals only if one assumes that deported individuals of different ethnic origins return to the United States at relatively equal rates, and therefore that Hispanics comprise 89% of individuals illegally re-entering the United States. As the district court aptly noted, however, common sense suggests that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so.

*United States v. Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003). The Fourth Circuit has rejected a similar line of attack. *See United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997) (declining invitation to reconsider the constitutionality of 21 U.S.C. § 841(b) "in light of a 1995 report by the United States Sentencing Commission showing that over eighty percent of those convicted for cocaine base trafficking or possession are black" and holding that "[t]he fact that the statute does not have a uniform racial impact, however, is not enough to establish an equal protection violation."); *see also United States v. McClendon*, 379 F. App'x 898, 901 (11th Cir. 2010) ("The disparate impact of the guidelines on African American defendants is insufficient to show that Congress had a discriminatory intent."). And of course, these holdings are in accord with longstanding Supreme Court precedent, including *Arlington Heights*, which itself states that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." 429 U.S. at 264-65; *see also Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups

within a class are ordinarily of no constitutional concern."); *Davis*, 426 U.S. at 242 ("[W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.").

For these reasons, the Court should also reject Ferretiz-Hernandez's attempt to demonstrate a cognizable disparate impact.

## V.     No hearing is necessary

The United States submits that no hearing is necessary for the Court to decide Ferretiz-Hernandez's motion. As discussed above, the United States largely does not contest the historical record cited with regard to the 1929 statute or the 1952 INA. Rather, the United States contends that, even accepting such a record, Ferretiz-Hernandez cannot establish that the motives of the 1929 Congress forever tainted the enactment of section 1326. Thus, there is no need for testimony to supplement that record.

## VI.    Conclusion

For all of the foregoing reasons, the Court should deny Ferretiz-Hernandez's motion to dismiss the indictment.

29

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney

By:     /s/ Patrick D. Scruggs
        Patrick D. Scruggs
        Assistant United States Attorney
        United States Attorney No. 140
        400 North Tampa Street, Suite 3200
        Tampa, Florida   33602
        Telephone:       (813) 274-6000
        E-mail: patrick.scruggs@usdoj.gov

**U.S. v. Jorge Ferretiz-Hernandez**          **Case No. 8:21-cr-213-RAL-SPF**

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Nicole Hardin, Esq.

Samuel Landes, Esq.

*/s/ Patrick D. Scruggs*
Patrick D. Scruggs
Assistant United States Attorney
United States Attorney No. 140
400 North Tampa Street, Ste. 3200
Tampa, Florida   33602
Telephone:     (813) 274-6000
Facsimile:     (813) 274-6125
E-mail:    patrick.scruggs@usdoj.gov
